**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JERRY T. MCGUIRE, Individually, On Behalf of the BP Employee Savings Plan, BP Capital Accumulation Plan, BP Partnership Savings Plan, BP DirectSave Plan, and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>BP CORPORATION NORTH AMERICA, INC., BP AMERICA, INC., BP p.l.c., BP CORPORATION NORTH AMERICA INC. SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE, INVESTMENT COMMITTEE, ANTHONY B. HAYWARD, LAMAR MCKAY, GREGORY T. WILLIAMSON, STEPHANIE C. ATKINS, RICHARD J. DORAZIL, NEIL SHAW, THOMAS L. TAYLOR, BYRON E. GROTE, STATE STREET BANK AND TRUST COMPANY,<br><br>     Defendants. | No.: |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT OF 1974**

Plaintiff, Jerry T. McGuire ("Plaintiff"), individually, as a representative of the BP Employee Savings Plan (the "ESP"), the BP Capital Accumulation Plan ("CAP"), the BP Partnership Savings Plan ("PSP"), the BP DirectSave Plan ("DSP") (collectively, the "Plan" or the "Plans"), and on behalf of a class of similarly situated participants in and beneficiaries of the Plans (collectively, the "Participants"), by his attorneys, alleges the following for his Complaint (the "Complaint"):

## INTRODUCTION

1.      Plaintiff brings this as a class action on behalf of the Plans and on behalf of all Participants of the Plans between October 30, 2009, and the present (the "Class Period") pursuant to §§ 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (3), against the Plan fiduciaries.  ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plans.

2.      Defendants, as fiduciaries of the Plans, breached their duties to the Plans and the Participants in violation of ERISA, particularly with regard to the Plan holdings of billions of dollars of American Depositary Shares ("ADSs") in BP p.l.c.  Defendants knew or should have known that investment in BP p.l.c. equity was – and continues to be – an imprudent investment of the Plan assets due to serious mismanagement and improper business practices that resulted in catastrophic incidents of international significance including, among others, the BP oil spill in the Gulf of Mexico.

## JURISDICTION AND VENUE

3.      **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4.      **Personal Jurisdiction**.  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

5.      **Venue**.  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the Defendants reside or maintain their primary place of business in this District, and some or all of the fiduciary breaches for which relief is sought occurred in this District.

## PARTIES

**Plaintiff**

6.      Jerry T. McGuire is a resident of Illinois.  Plaintiff is a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff McGuire's individual plan account.

**Defendants**

7.      BP Corporation North America, Inc. and BP America, Inc. are subsidiaries of BP p.l.c.  BP Corporation North America, Inc. has its headquarters in Warrenville, Illinois.  BP America, Inc. has its principal place of business in Warrenville, Illinois.  BP Corporation North America, Inc. and BP America, Inc. and their respective subsidiaries are collectively referenced herein as "BP."  BP is the sponsor of the Plans, defined contribution plans governed by ERISA for the benefit of certain U.S. employees of BP.

8.      BP p.l.c., a United Kingdom-based company, is one of the world's largest energy companies, with extensive contacts in the U.S.  It is the largest producer of oil and gas offshore in the deepwater Gulf of Mexico.  Its onshore gas operations enabled the company to become one of the largest gas producers in the U.S.  BP p.l.c. operates tens of thousands of miles of pipelines in the U.S., has several refineries in the U.S., and is the second-largest gasoline marketer in the U.S.  BP p.l.c. has approximately 29,000 employees in the U.S., one-third of its total worldwide employees.

9.      Upon information and belief, BP and BP p.l.c., at all times, acted through their officers, directors and employees, and members of committees who were appointed to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the companies.

10.     Anthony B. Hayward ("Hayward") is the Chief Executive Officer of BP p.l.c. and a member of its Board of Directors.  Hayward also serves as Chief Executive of Defendant BP America, Inc.

11.     Upon information and belief, Defendant BP Corporation North America Inc. Savings Plan Investment Oversight Committee (the "Savings Plan Committee") is a named fiduciary of the Plans.

12.     Lamar McKay ("McKay") served as a member of the Savings Plan Committee during the Class Period.  McKay is currently the Chairman and President of BP America Inc. and Chief Representative of BP p.l.c. in the United States.  According to McKay's testimony before Congress on May 11, 2010, he is "BP's lead representative in the U.S. and [is] responsible for broad oversight and connectivity across all of [BP's] U.S. based businesses."  Defendant McKay testified before Congress again on June 15, 2010, concerning BP's efforts and his role in cleaning up the oil spill in the Gulf of Mexico.

13.     Gregory T. Williamson ("Williamson") served as the Director of Trust Investments for BP America, Inc., the parent company of BP Corporation North America Inc. during the Class Period.  Williamson also served as the Secretary and a member of the Savings Plan Committee during the Class Period.

14.     Stephanie C. Atkins ("Atkins") served as a member of the Savings Plan Committee during the Class Period.  Atkins also served as the Vice President Human Resources WY Operations and SAP Development during the Class Period.

15.     Richard J. Dorazil ("Dorazil") served as a member of the Savings Plan Committee during the Class Period.  Dorazil also served as the Vice President, Total Rewards, Western Hemisphere BP America at Washington.  Defendant Dorazil signed BP p.l.c.'s Forms 11-K filed

with the U.S. Securities and Exchange Commission ("SEC") during the Class Period in his capacity as the Plan Administrator.

16.     Neil Shaw ("Shaw") served as a member of the Savings Plan Committee during the Class Period.  Shaw also served as a Strategic Performance Unit Leader during the Class Period.  Shaw was in charge of BP's Gulf of Mexico division.

17.     Thomas L. Taylor ("Taylor") served as a member of the Savings Plan Committee during the Class Period.

18.     Savings Plan Committee, Williamson, Atkins, Dorazil, McKay, Shaw and Taylor are collectively referenced herein as the "Savings Plan Committee Defendants."

19.     Upon information and belief, Defendant the Investment Committee (the "Investment Committee") is a named fiduciary of the Plans, with fiduciary responsibility over the selection and removal of Plan investment options.

20.     Byron E. Grote ("Grote") is the Chief Financial Officer of BP and, upon information and belief, is a named fiduciary of the Plans in the event an Investment Committee is not appointed.

21.     State Street Global Advisors, the investment management arm of State Street Bank and Trust Company ("SSBT") served as the Investment Manager of the BP Stock Fund. SSBT maintains offices in Illinois.  SSBT was the trustee of the Plans during the Class Period.

## THE PLANS

22.     On information and belief, the relevant provisions of all four of the BP Plans are the same except for the groups of employees covered by each Plan and the contribution and matching provisions of each Plan, as set forth below.  The basis for this belief is the fact that BP filed a singe Form 11-K Annual Report for 2009 Plan year with the SEC on June 16, 2010

("2009 Form 11-K") for all of the Plans collectively, describing the Plans' administrative provisions in common except for differences in matching and contribution limits.

23.     The Plans are "employee pension benefit plan[s]" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and defined contribution plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

24.     The Plans are legal entities that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans.  Plaintiff seeks Plan-wide relief.

25.     According to the 2009 Form 11-K, the purpose of the Plans is to "encourage eligible employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement."

26.     Fidelity Investments Institutional Services Company, Inc. is the record keeper for the Plans.

27.     Dorazil, the Company's Vice President-HR Total Rewards, Western Hemisphere is the Plan Administrator.

28.     The assets of the Plans are held by the BP Master Trust for Employee Savings Plan (the "Master Trust").

29.     According to the 2009 Form 11-K, Participants could make contributions to each of the Plans during the Class Period as follows:

30.     Participants of the ESP could contribute up to 80% (100% prior to May 1, 2009) of their qualified pay, subject to statutory limits.

31.     Participants of the CAP could contribute up to 27% of their qualified pay, subject to statutory limits.

32.     Participants of the PSP could contribute up to 80% (100% prior to May 1, 2009) of their qualified pay, subject to statutory limits.

33.     Participants of the DSP could contribute up to 80% (100% prior to May 1, 2009) of their qualified pay, subject to statutory limits.

34.     According to the 2009 Summary Plan Description, for the ESP, the Company makes a company-matching contribution equal to 100% of every dollar contributed by Participants (excluding rollover contributions), up to 7% of Participants' eligible pay each pay period.

35.     Participants of the ESP may elect to direct their employee contributions to any of the investment options offered by the ESP.  According to the August 2009 Update #3 to the August 2008 Investment Options Guide, the investment options are separated into three tiers. Tier I consists of Target Date Funds.  The investment options in Tier II represent major asset classes - stocks, bonds and short-term investments.  Tier III is a unitized fund comprised of BP ADSs (the BP Stock Fund) and cash to facilitate daily transactions.

36.     The BP Stock Fund consists almost entirely of BP ADSs. The BP Stock Fund seeks to match the investment return of BP ADSs.  A BP ADS is a security created to allow easier holding and trading of equity interests in BP p.l.c. in the United States.  Each BP ADS represents six BP p.l.c. ordinary shares.  BP ADSs are traded on the New York Stock Exchange. JP MorganChase Bank is the depositary of the BP ADSs.

37.     According to the 2009 11-K for fiscal year 2009, the Master Trust held $2.45 billion worth of BP ADSs, or 29% of total Master Trust assets, $8.27 billion, at the end of the 2009.

38.     Defendants, as Plan fiduciaries, were required by ERISA to furnish information to Participants.   ERISA § 101, 29 U.S.C. § 1021, requires the Plan administrator to furnish Summary Plan Descriptions (SPDs) to Participants.   The Plan document, the SPD and the Plan Investment Options Guide (and updates), a supplement to the SPD in effect during the Class Period, incorporates by reference certain information filed with the SEC by BP p.l.c., thereby making such SEC filings fiduciary communications with the Participants.

## DEFENDANTS ARE FIDUCIARIES OF THE PLANS

39.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or management or disposition of the Plan assets.

40.     ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).  The administrator of the Plans is the Senior Vice President-Human Resources or an Applicable Named Fiduciary who is identified as an Administrator.  The Plans also provide that a Fiduciary is (a) any individual or entity that a Designated Officer (Senior Vice President and any other officer of BP, the Group Vice President, Human Resources of B.P. p.l.c. and any other officer of BP p.l.c.) identifies to be an Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of

the ESP and (b) any individual or entity that an Administrative Named Fiduciary, acting on behalf of the Plans, designates to be a Fiduciary.

41.     ERISA treats as fiduciaries all persons explicitly named as fiduciaries under ERISA § 402(a)(1), and any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

42.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans, and the Plan investments solely in the interest of the Participants and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

43.     Instead of delegating all fiduciary responsibility for the Plans to external service providers, BP chose to internalize at least some of these fiduciary functions.

44.     During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

**Defendant BP**

45.     BP was a fiduciary of the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority

9

or control with respect to the management of the Plan assets, exercised discretionary authority or control with respect to the management of the BP Stock Fund, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries during the Class Period.

46.     BP was responsible for communicating with Participants regarding the Plans, and providing Participants with information and materials required by ERISA. BP drafted and disseminated various documents and materials related to the Plans, including but not limited to, the summary plan descriptions and the documents incorporated into the summary plan descriptions.

47.     BP was a Plan fiduciary because it had the discretion and authority to direct the liquidation of the BP Stock Fund if it independently determined that it was no longer a prudent investment.

48.     BP was a Plan fiduciary to the extent it exercised its authority to select, monitor, retain, and remove the administrator and/or fiduciaries and members of any committees or other individuals charged with the administration of the Plans and, accordingly, exercised authority and oversight over the administrator and/or fiduciaries and such committees, which reported to the Board of Directors of BP regarding their fiduciary duties and responsibilities to the Plans and with respect to their actions pertaining to the same.

49.     BP was imputed with the knowledge that its officers and employees had of the misconduct alleged herein, even if not communicated to BP, and BP is liable for these actions.

**Defendant BP p.l.c.**

50.     The Plan also provides that a Fiduciary is (a) any individual or entity that a Designated Officer (Senior Vice President and any other officer of BP, the Group Vice President, Human Resources of B.P. p.l.c. and any other officer of BP p.l.c.) identifies to be an

Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of the Plan and (b) any individual or entity that an Administrative Named Fiduciary, acting on behalf of the Plan, designates to be a Fiduciary.

51.     According to BP p.l.c.'s Annual Report and Accounts 2009, BP p.l.c.'s audit committee reviewed risk management and investment strategy related to pensions and other post-retirement benefits.

52.     Accordingly, BP p.l.c. was a Plan fiduciary to the extent it exercised its authority to select, monitor, retain, and remove the administrator and/or fiduciaries and members of any committees or other individuals charged with the administration of the Plans and, accordingly, exercised authority and oversight over the administrator and/or fiduciaries and such committees, which reported to the Board of Directors of BP regarding their fiduciary duties and responsibilities to the Plans and with respect to their actions pertaining to the same.

**Defendant Hayward**

53.     Hayward was a Plan fiduciary to the extent he exercised BP p.l.c.'s authority under the Plans to identify an Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of the Plans.

54.     Additionally, Hayward acted as a Plan fiduciary by communicating regularly and directly with employees regarding the financial health of BP and the security of their retirement savings despite his knowledge of and direct involvement in BP's risky and dangerous operations and business decisions that put BP as well as the Participants' Plan investment at substantial risk. Despite the plummeting value of BP ADSs during the Class Period, in no small measure due to Hayward's own actions, Hayward continued erroneously to encourage employees that their retirement savings were not in peril.

**Defendant SSBT and the Savings Plan Committee Defendants**

55.     According to the Plan Investment Options Guide that was disseminated to Participants, the Investment Manager for the BP Stock Fund, "may attempt to liquidate all the BP ADSs in the BP Stock Fund should the investment manager **or** BP determine such an investment is no longer prudent."  (Emphasis added.)

56.     During the Class Period, SSBT was a fiduciary of the Plans because it had independent discretion and authority to liquidate the BP Stock Fund.

57.     Upon information and belief, the Savings Plan Committee Defendants have the authority to direct the investment management of the Plan funds, including the authority to hire investment managers to manage the funds.

58.     According to the terms of the Plans, an "Applicable Named Fiduciary" is, with respect to any authority, control or discretion in the operation, administration, or management of the Plans or Trust, the Administrative Named Fiduciary who is charged with, or who exercises responsibility for, such matter.

59.     Upon information and belief, the Savings Plan Committee Defendants and SSBT as the investment manager of the BP Stock Fund, were charged with designating investment funds for the Plans, establishing rules and procedures with respect to the Plan investment funds and monitoring the performance of the Plan investments.  Upon information and belief, the Savings Plan Committee Defendants and SSBT were appointed by BP and BP p.l.c.  Upon information and belief, the Savings Plan Committee Defendants and SSBT were fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan management, administration, investments, and assets.

60.     Upon information and belief, the Plans and their assets are administered and managed by the Savings Plan Committee Defendants and SSBT, selected and monitored by BP. Upon information and belief, the Savings Plan Committee Defendants and SSBT exercised broad responsibility for management and administration of the Plans and, among their other duties, were responsible for oversight of the Plan investment options, policies, and the performance of the Plan investments, as well as the review of investment managers.

61.     The Savings Plan Committee Defendants and SSBT communicated with Participants regarding the Plans, and provided Participants with information and materials required by ERISA.  In this regard, on behalf of BP, the Savings Plan Committee Defendants and SSBT disseminated Plan documents and materials.

**Defendants Investment Committee and Grote**

62.     Upon information and belief, the Investment Committee (or, if there is no Investment Committee, Defendant Grote) selects, monitors and removes all Plan Investment Options.  During the Class Period, the Investment Committee Defendants and Defendant Grote were fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan management, administration, investments, and assets.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action in the event that class action procedures are deemed necessary by the Court, pursuant to Rules 23(a), (b)(1), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plans
> at any time during the Class Period, between October 30, 2009 and
> the present, whose accounts included units of the BP Stock Fund.

Excluded from the Class are Defendants and members of the Defendants' Immediate Families, any entity in which a Defendant has a controlling interest, and their heirs, Successors-In-Interest, or assigns (in their capacities as heirs, Successors-In-Interest, or assigns).

64.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plans during the Class Period.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and other Class members;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and other Class members by failing to act prudently and solely in the interests of Participants;

(c)     whether Defendants violated ERISA; and

(d)     whether the Class members have sustained damages and, if so, the proper measure of those damages.

66.     Plaintiff's claims are typical of the claims of the other members of the class because Plaintiff and the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

69.     Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

70.     In the alternative, if the Court determines that class certification is not necessary and/or not appropriate, Plaintiff requests that the Court recognize Plaintiff's legal right to obtain complete recovery for all four Plans for the fiduciary violations alleged in this Complaint pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).  Section 502(a)(2) states that "[a] civil action may be brought . . . by a participant . . . for appropriate relief under section 1109 of this title. . . ."  ERISA Section 409(a), 29 U.S.C. § 1109(a), states:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable **to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary**, and shall be subject to such other equitable or remedial

relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added.)

## FACTS BEARING ON DEFENDANTS' FIDUCIARY BREACHES

71.     As a consequence of BP's inadequate safety measures in place for its oil and gas operations and the resulting devastating effect this could have on the BP Stock Fund in the Plans, Defendants knew of or should have known that BP ADSs were an imprudent investment for the Plans.  Defendants failed to protect the Participants' retirement savings from being imprudently invested in the BP Stock Fund, and as a result, the Plans suffered losses, for which the Defendants are liable.

72.     On October 30, 2009, the first day of the Class Period, BP was fined $87 million for "outstanding life threatening safety problems" in connection with a March 23, 2005, accident at the BP Texas City Refinery that left 15 workers dead and 170 injured.  Hilda Solis, the Secretary of the Department of Labor, stated that there still existed 439 "willful and egregious safety violations" that could result in another catastrophic accident.  Jordan Barab, an assistant secretary at OSHA stated, "Just the fact that there are still so many outstanding problems, life-threatening problems, at this plant, indicates that they still have a systemic safety problem."  BP claimed that it would clean up its safety record.  However, they have not done so.  Rather, such systemic safety problems have resulted in the current catastrophic oil spill in the Gulf of Mexico.

73.     The U.S. Chemical and Safety Hazard Investigation Board ("CSB") investigated BP's safety performance at Texas City as well as the role played by BP management in the explosion.  According to the CSB's report, the disaster was caused by organizational and safety deficiencies at all levels of BP p.l.c.  In September 2005, BP Products North America, a subsidiary of BP, settled with the Occupational Safety and Health Administration for the Texas

refinery accident for $21.4 million.  This represented the largest industrial accident settlement of its kind.  On December 9, 2005, BP vowed to spend $1 billion over the next five years to enhance safety.  On March 23, 2006, news emerged that a document written in 2005, weeks before the Texas City explosion, showed that Company officers feared that safety violations would lead to deaths at the Texas plant.  In January 2007, an independent panel reviewing BP's safety found that faulty safety practices caused the Texas City disaster, that cost cutting and maintenance cutting had been severe, that profits took precedence over safety and that the company had not established a trusting environment and as a result, prior warnings about the plant's safety went unheeded.  The report also provided a series of suggestions on safety.

74.     On March 2, 2006, less than one year after the Texas City disaster, BP discovered a leak in a pipeline in the Western Operating Area of the Prudhoe Bay in Alaska (and also the largest oil field in the U.S.) which caused a spill of more than 200,000 gallons of oil.  On October 25, 2007, BP subsidiary BP Exploration Alaska Inc. pled guilty to a criminal violation of the Clean Water Act and was sentenced to three years' probation.  A Congressional committee later determined that BP p.l.c. had ignored opportunities to prevent the spill and that "draconian" cost-saving measures had led to shortcuts in its operations. The Prudhoe Bay incident and the Texas City disaster led to the resignation of John Browne, BP's former CEO.  BP p.l.c. promised again that it would change and improve its safety.

75.     In BP p.l.c.'s 2007 SEC Form 20-F, BP p.l.c. stated, "throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.  We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on

the incident in January 2007. . .  We have made material progress throughout the group across all of the panels 10 recommendations."

76.     When Hayward took office as chief executive officer in 2007, he promised to change BP p.l.c.'s culture, with a renewed commitment to safety.  Hayward represented that his first priority was "focusing like a laser on safe and reliable operations."  Subsequent events belied Hayward's purported commitment to safety, as BP p.l.c. has expanded its underwater drilling operations across the globe coupled with severe cost-cutting measures. While aggressively seeking to grow and expand, BP p.l.c. was also implementing methods of keeping costs down, including failing to provide adequate safety measures for BP's oil and gas exploration operations.

77.     In March 2009, BP identified operations in the Gulf of Mexico as one of its primary economic drivers, highlighting the fact that it was one of the largest deepwater operators in the world. At the same time, BP failed to disclose that its Gulf of Mexico operations were exceedingly risky and that it had deficient safety protocols in place to deal with potential disasters.

78.     In its 2009 Annual Form 20-F, filed on March 5, 2010, BP p.l.c. stated in a section entitled "Safety" that "Good progress is being made on underpinning improved safety performance in 2009. Throughout the year, we continued to focus on training and enhancing procedures across the organization" and touted the "continued success of our Gulf of Mexico deepwater operations."

79.     On November 19, 2009, David Rainey, Vice President for Gulf of Mexico Exploration for BP appeared before the Senate Energy and Natural Resources Committee, and stated that advances in technology had enabled the industry to reduce the occurrence of oil spills

and other environmental consequences of offshore drilling.  Rainey also stated that developments over the last 50 years have made it easier to protect the environment. While Rainey acknowledged the general risks of drilling for oil in the Gulf of Mexico, he omitted the material fact that BP had not implemented adequate safety provisions, and therefore was highly exposed to operational risks in the Gulf of Mexico.

80.     Rainey also provided a written statement to the Senate Energy and Natural Resources Committee.  In discussing safety specifically, Rainey stated: "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents."

81.     On February 26, 2010, BP p.l.c. issued its 2009 Annual Review. The Annual Review included a letter from Chairman of the Board Carl-Henric Svanberg, stating "Risk remains a key issue for every business, but at BP it is fundamental to what we do.  We operate at the frontiers of the energy industry, in an environment where attitude to risk is key.  The countries we work in, the technical and physical challenges we take on and the investments we make - these all demand a sharp focus on how we manage risk.  We must never shrink from taking on difficult challenges, but the board will strive to set expectations of how risk is managed and remain vigilant on oversight."

82.     In reality, however, BP and BP p.l.c. were sacrificing the management of risk in order to maximize profits, meaning that it was prepared to put its employees, the public and the environment at substantial risk in order to save money on such items as a back-up blowout preventer at the *Deepwater Horizon*.

83.     In the 2009 Annual Review, Hayward wrote, "Despite these difficult conditions, a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to focus on safe and reliable operations."

84.     Hayward went on to tout BP p.l.c.'s Gulf of Mexico operations stating that BP is "the largest producer and leading resource holder in the deepwater Gulf of Mexico."  Hayward reassured investors that risks were being handled appropriately.  He stated, "BP has always operated at the frontiers of the energy industry and our core strengths are more relevant and valuable than ever. BP's experience, skills, capability, technology and access to markets enable resource holders to maximize returns over the long term. We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs."

**The *Deepwater Horizon* Disaster**

85.     BP p.l.c. is the holder of a lease that allows BP to drill for oil and perform oil production-related operations at the Macondo well site in the Mississippi Canyon 252 section of the outer continental shelf in the Gulf of Mexico close to the states of Louisiana, Mississippi, Alabama and Florida.  The *Deepwater Horizon*, a mobile offshore drilling unit owned and built by Transocean, had been chartered by BP and completion operations of the well were directed by BP. As the operator of the well that the *Deepwater Horizon* had drilled, BP was ultimately responsible for ensuring that appropriate safety protocols were implemented and followed.

86.     BP was aware of or should have known that drilling at the depths that the *Deepwater Horizon* was drilling posed increased risks.  BP knew or should have known that in the Gulf of Mexico it was appropriate to spend more money and adopt stricter safety procedures because of the heightened risks and dangers.  BP, however, chose to ignore such risks in order to

20

cut costs while assuring the Participants and public that its Gulf of Mexico operations were maintained and operated with the utmost adherence to safety.

87.     On the evening of April 20, 2010, an explosion erupted on the *Deepwater Horizon*.  Two days after the explosion, on April 22, 2010, the *Deepwater Horizon* sank and began discharging oil into the Gulf of Mexico. Eleven workers died because of the *Deepwater Horizon* explosion and to this day, BP has yet to stop the leaking of crude oil into the Gulf of Mexico.

88.     The *Deepwater Horizon* was connected to the wellhead on the seal floor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* sank to the bottom, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser bent into a crooked shape underwater, and now snakes along the ocean floor and in the deepest waters slightly above it. Oil was leaking from the open end of the riser and from three places along its length.

89.     According to a preliminary analysis, bad wiring and a leak in what is supposed to be a "blowout preventer" may have contributed to the explosion. Sealing problems may have allowed a methane eruption.  Even a dead battery may have been part of the cause of the incident. Congressional investigators revealed on May 12, 2010, that a key safety system, known as the blowout preventer, used in BP's oil-drilling rig in the Gulf had a hydraulic leak and a failed battery that probably prevented it from working as designed.  Based on new disclosures, it was revealed that a complicated cascade of deep-sea equipment failures and procedural problems played a major role in the oil rig explosion and massive spill that is still fouling the waters of the Gulf of Mexico and threatening industries and wildlife near the coast and on shore. All of these problems were the result of BP p.l.c.'s failure to adhere to safety procedures.

90.     BP p.l.c. told the House Energy and Commerce Subcommittee on Oversight that the well that exploded had failed a key pressure test hours before the April 20, 2010, explosion. According to Steven Newman, president of Transocean, and McKay, these pressure readings were worrisome. Despite these worrisome pressure readings, the companies did not suspend operations.

91.     Workers on the *Deepwater Horizon* told BP p.l.c. internal investigators in interviews that the blowout was triggered by a bubble of methane gas that escaped from the drilling well and shot up the drill column. The bubble expanded quickly after it escaped from the drilling well and burst through several seals and barriers before exploding.

92.     After the explosion, BP attempted to downplay and conceal the severity of the oil spill.  An initial leak estimate of 1,000 barrels (42,000 gallon) per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels (200,000 gallons) per day. Moreover, BP p.l.c. was slow and incomplete in its announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

93.     While BP had initially tried to convince the public that the *Deepwater Horizon* was discharging only 1,000 barrels a day into the oil, the evidence soon forced them to change their estimates to approximately 5,000 barrels of oil a day. In a worst case scenario, experts estimated that the *Deepwater Horizon* was discharging up to 60,000 barrels of oil a day.

94.     BP has struggled to develop containment systems for the crude oil leaking into the Gulf of Mexico.  On May 10, 2010, BP p.l.c. Chief Operating Officer Doug Suttles admitted that BP was woefully unprepared to mitigate the damage of the *Deepwater Horizon* incident due to its location.  Suttles stated, "There's a lot of techniques available to us.  The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water."

95.    Defendants knew of should have known that there was a high probability that something of this magnitude could occur.    On June 14, 2010, the U.S. Congressional Subcommittee on Oversight and Investigations sent a letter to Hayward detailing serious questions about the decisions made by BP in the days and hours before the explosion on the *Deepwater Horizon*.  The letter states in part:

> On April 15, **five days before the explosion, BP's drilling engineer called Macondo a "nightmare well."**  In spite of the well's difficulties, BP appears to have made multiple decisions for economic reasons that increased the danger of a catastrophic well failure.  In several instances, these decisions appear to violate industry guidelines and were made despite warnings from BP's own personnel and its contractors.  In effect, it appears that BP repeatedly chose risky procedures in order to reduce costs and save time and made minimal efforts to contain the added risk.
>
> At the time of the blowout, the Macondo well was significantly behind schedule. This appears to have created pressure to take shortcuts to speed finishing the well. In particular, the Committee is focusing on five crucial decisions made by BP: (1) the decision to use a well design with few barriers to gas flow; (2) the failure to use a sufficient number of "centralizers" to prevent channeling during the cement process; (3) the failure to run a cement bond log to evaluate the effectiveness of the cement job; (4) the failure to circulate potentially gas-bearing drilling muds out of the well; and (5) the failure to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below. The common feature of these five decisions is that they posed a trade-off between cost and well safety.  (Emphasis added.)

96.    According to one of the survivors of the *Deepwater Horizon*, BP had known about potential problems on the *Deepwater Horizon* for months prior to the accident.  The survivor informed *60 Minutes* that BP had initially estimated work to take 21 days.  However, as the time for setting up the latest well extended to six weeks, BP management became agitated and ordered workers to speed up the schedule.  An earlier problem with the well had cost BP an extra $25 million.  BP management pressured the workers on the oil rig in order to make up that loss.  The *Deepwater Horizon* survivor told 60 Minutes that BP was continuously pressuring

them to work quickly, however when the timeline for drilling the Macondo well got delay coupled with the loss of $25 million in an earlier incident, BP managers ordered the drillers to speed up the rate of penetration.

97.     Approximately four-to-five weeks prior to the *Deepwater Horizon* incident, chunks of the annular on the blowout preventer had broken off and floated to the surface. The annular is a critical part of the blowout preventer used to ensure that explosive gas does not escape to the surface. BP also knew in the weeks and months prior to the incident that the battery on the blowout preventer was weak and one of the control pods on the blowout preventer was broken.  According to an engineering expert, Robert Bea, the malfunctioning control pod is "like losing one of your legs."  Not only did the blowout preventer on the *Deepwater Horizon* fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail.

98.     On June 19, 2010, in an article entitled "BP Relied on Cheaper Wells," the Wall Street Journal reported that its analysis showed how BP regularly employed "risky" long string design well designs that skimped on industry-standard safety measures rather than the safer and more costly liner tieback design used by BP's.  The article stated, in part:

> The design was used on the well that exploded in the Gulf of Mexico on April 20, killing 11 workers and causing America's worst offshore oil spill. The only other major well design, which is more expensive, includes more safeguards against a natural-gas blowout of the kind that destroyed the *Deepwater Horizon*.
>
> A Journal analysis of records provided by the U.S. Minerals Management Service shows that BP used the less costly design— called "long string"—on 35% of its deepwater wells since July 2003, the earliest date the well-design data were available. Anadarko Petroleum Corp., a minority partner of BP's in the destroyed well, used it on 42% of its deepwater Gulf wells, though it says it doesn't do so in wells of the type drilled by BP.

Both companies used the design much more often, on average, than other major Gulf drillers. Out of 218 deepwater wells in the Gulf drilled since July 2003, 26% used the long-string design. It derives its name from its use of a single, long "string" of pipe from the sea floor to the bottom of the well.

Other big drillers use long-string design less frequently than BP, according to the Journal's data analysis.

*       *       *

A long-string design is cheaper because a single pipe runs the length of the well and can be installed in one step. But it also can create a dangerous pathway for natural gas to rise unchecked outside the pipe.

*       *       *

The other method, known as "liner tieback," is more complex and costlier. First, a section of pipe called a liner is placed at the bottom of the well and cemented into place, creating an extra barrier to prevent natural gas from rising to the surface. Typically, another pipe is connected to the liner to create a pipe to the surface.

*       *       *

A letter to BP's CEO, Mr. Hayward, by two Democratic Congressmen ahead of his testimony to their committee on Thursday, said the choice of the long-string design for the Horizon well was one of five decisions BP made that posed a trade-off between cost and well safety.

99.     Moreover, BP failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.  First, BP elected not to install an acoustically activated remote-control shut-off valve, costing only $550,000. Such acoustic switches are mandated in countries like Brazil and Norway, and are employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of BP and other oil companies.  Second, BP chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor. BP ignored these

precautions despite being well aware of the increased risk of a failure of the primary blowout safety mechanism, the blowout preventer, from deep-sea operators.

100.    Over ten years ago, the U.S. Minerals Management Service ("MMS") sent out an industry-wide safety alert ordering companies drilling in deep water in the outer continental shelf to have effective backup systems. The March 2000 notice stated: "The MMS considers a backup [blowout preventer] actuation system to be an essential component of a deepwater drilling system, and therefore expects OCS operators to have reliable back-up systems for activating the [blowout preventer]." MMS, however, left it up to the individual companies to decide what kind of backup system to use. BP chose the cheapest method, electing not have a backup system for activating the blowout preventer on the *Deepwater Horizon*.

101.    Earlier incidents also provided warnings of similar risk, such as an MMS study that noted that blowouts during cementing work were continuing with alarming regularity, particularly in the Gulf of Mexico. Cementing was a factor in 18 of 39 well blowouts in the Gulf of Mexico between 1992 and 2006.

102.    BP's direction of the completion operations of the well, in particular the installation of the final cement casing at the wellhead prior to the conclusion of the exploratory phase of the well, was carried out by Halliburton and BP with extreme recklessness. As The New York Times reported on May 3, 2010: "More than a half-dozen workers who were on the rig at the time of the explosion told the lawyers that the rig operator had seemed to be rushing to finish and detach from the well - a possible factor that could have contributed to the explosion."

103.    The explosion that sank the drilling rig came less than a day after workers finished pumping concrete into the well, a step toward closing it off temporarily. BP planned to return to the well later to set up a permanent rig and start producing oil.

104.   Encasing a well in concrete is one of the most critical aspects of oil drilling, and presents many risks.  The concrete involved is highly specialized. It needs to be blended and stirred properly. It also must be pumped down into the well so that it comes out the bottom and oozes back up around the well casing, forming a tight seal.

105.   The concrete work apparently did not achieve a complete seal, and natural gas started seeping into the well in the late stages, the lawyers said.  However, idling a rig to address such a problem can cost huge sums. Lawyers said that supervisors either missed or ignored the signals and proceeded with the job.

106.   In addition, BP was aware of or should have known that an August 2009 blowout in the Timor Sea off the coast of Australia, which was found to have been caused by careless cementing work. During that incident, which bears a strong resemblance to the *Deepwater Horizon* disaster, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

107.   Employees working on the *Deepwater Horizon* experienced recurring problems with pockets of highly flammable natural gas forcing its way up the drilling pipes. Prior to the *Deepwater Horizon* incident, BP did not view these incidents as problematic, but instead stated that the gas was likely to only create a "negligible" risk. The government, however, cautioned BP that gas buildup was a genuine concern and that BP should take note and "exercise caution." In the weeks leading up to the *Deepwater Horizon* incident, so much natural gas rose to the surface that an emergency announcement called for a stop to all "hot work," meaning any welding, cooking or any other use of fire or igniters.  Smaller emissions of gas also slowed work at the rig on other occasions too.

108.    Despite the dangers posed by the extreme gas build up, BP allowed Halliburton to employ a risky technique of mixing nitrogen gas into the cement to create a mousse-like compound employees on the *Deepwater Horizon* have suggested that workers were motivated to finish early in order to earn bonuses for finishing the job ahead of schedule.

109.    The New York Times has also reported that: "At least one worker who was on the oil rig at the time of the explosion on April 20, and who handled company records for BP, said the rig had been drilling deeper than 22,000 feet, even though the company's federal permit allowed it to go only 18,000 to 20,000 feet deep."

110.    As the oil continues to make landfall along the Gulf Coast, it has caused and will continue to cause severe damages to the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, and Florida, destroying the habitats where countless species of fish and marine life breed, spawn, and mature.

111.    In addition, the Gulf accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output.  Nearly a third of all marine recreational fishing trips, including the $1 billion-per-year sport fishing industry, take place on Gulf waters.  All of these activities and business are now in serious jeopardy.

112.    Aside from economic damage to the fishing, tourism, shipping and oil industries, among others, the clean-up is having deleterious health effects on clean-up workers.

113.    In the months following the *Deepwater Horizon* incident, BP has been unable to stop the gushing of thousands of gallons of oil into the Gulf Coast waters.  While BP finally was able to contain some of the oil spill beginning in June 2010, approximately six weeks after the disaster, complete containment will likely not occur until August 2010 and oil may reach the

shores far up the east coast of the United States.  At the time of this filing, BP has not stopped the flow of oil into the Gulf of Mexico.

114.    In mid-June, BP agreed to set aside a $20 billion escrow fund over the next few years to pay damage claims to thousands of fishermen and others living and working along the Gulf Coast. BP also said that it would sell oil and gas fields and cut investments in drilling if necessary to ensure BP has enough money to pay for any such costs.

115.    With the public losing faith in Hayward's efforts to respond to the continuing oil spill crisis, BP replaced Hayward with Robert Dudley, a BP managing director.

116.    On April 19, 2010, the day before the *Deepwater Horizon* disaster, BP ADSs closed at $59.88.  Since that time, as a result of the oil spill, the price of BP ADSs trended as low as $29, a decline of more than 50%, resulting in over $70 billion in losses to BP p.l.c.'s market capitalization, and hundreds of millions of dollars in losses to the Plans.

117.    With the price of BP ADSs in a steady decline since the first day of the *Deepwater Horizon* explosion, stock analysts are questioning whether BP and BP p.l.c. can survive as a going concern.  In commenting on whether Hayward would resign or BP p.l.c. would issue a dividend, one analyst stated "'[t]he situation is now beyond both of these points and the key question is can BP survive?'"  *See Benn Harrington, BP Survival Worries Drag FTSE 100 Down*, telegraph.co.uk, June 1, 2010.

118.    Hayward, in an email to employees on May 19, 2010, recognized that employees were concerned about the impact of the *Deepwater Horizon* disaster on their pensions.  Rather than tell them the true impact, Hayward misleadingly assured employees that BP p.l.c. had enough financial strength to respond to the disaster.  Hayward stated, in part:

> Let me first of all reiterate that since we started on the Forward
> Agenda in 2007 - safe, reliable and efficient operations have been

the number one priority on our corporate agenda. I believe that within BP there can be no doubt that this is the case, and I am absolutely determined that it will remain that way. Since 2007, our recordable injury frequency has reduced by 29%, and the number of high potential incidents has decreased by 35% - with a reduction of close to 40% for process safety related high potential incidents. I am proud of this improvement. And our current challenges completely reinforce my determination to improve further.

\*       \*       \*

I have said all along that we will be judged by how we respond, and that remains the case. The strength of the BP balance sheet allows us to take on this responsibility. I know that many of you have questions about how this incident will impact BP, your jobs, pensions, and our future plans. We have demonstrated robust cash flow generation over the past few quarters and at the end of 1Q our gearing ratio was below our 20 to 30% target range, at 19% or some $25 billion. We can therefore afford to do the right thing, and we will do just that - our financial strength will also allow us to come through the other side of this crisis, both financially secure and stronger as a result of what we have learned from this tragic incident and how we have responded.

119.    However, Hayward did not tell employees that several possible scenarios could mean the end for BP.  For example, if the government chose to prosecute BP under the Clean Water Act, it could be fined $4,300 for each barrel leaked into the Gulf, making BP liable for over $100 billion which could bankrupt BP.  Moreover, some reports have noted that as a result of criminal fines, BP could lose billions in government contracts, *i.e.*, military contracts for aviation fuel and other products.

120.    In addition, Hayward has publicly stated that "BP is a 'responsible party' under the Oil Pollution Act. This means that federal law requires BP, as one of the working interest owners of Mississippi Canyon 252, to pay to clean up the spill and to compensate for the economic and environmental impacts of the spill. Let me be clear: BP has accepted this responsibility and will fulfill this obligation." *See Prepared Testimony of Tony Hayward to*

*United States House of Representatives, Committee on Energy and Commerce, Subcommittee on*

*Oversight and Investigations, June 17, 2010.*

121.     Some analysts estimated the legal costs in connection with the spill to exceed $60

billion alone and others estimate that clean up costs to be between $15 and $40 billion.  However

a jury verdict against BP and/or BP p.l.c. could take the cost of the spill into hundreds of billions

of dollars.  Analysts on Wall Street refer to this as the "Texaco Scenario," referring to the 1987

verdict against Texaco which forced it to file Chapter 11 because it could not afford to pay a jury

award.  *See* Andrew Ross Sorkin, *Imagining the Worst for BP's Future*, N.Y. Times, June 7,

2010, at B1.

## MISMANAGEMENT OF THE PLAN ASSETS

122.     Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this

Complaint, Defendants had a duty to discharge their duties with respect to the Plans with the

care, skill, prudence and diligence under the circumstances then prevailing that a prudent person

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise

of a like character and of like aims, and to diversify investments in the Plans so as to minimize

the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

123.     Defendants are not entitled to the protections of ERISA § 404(c), 29 U.S.C. §

1104(c), because (i) Participants did not exercise independent control over their accounts, (ii)

Defendants subjected Participants to improper influence with respect to the Plan investments in

the BP Stock Fund, and (iii) Defendants concealed material non-public information concerning

the adequacy of BP's safety protocols that Defendants were not precluded from disclosing under

applicable law.

124.     SSB&T is not entitled to the protections of Department of Labor regulation

§ 2550.404a-1(b)(3)(ii) because it knew or should have known that the information, if any,

provided by it's co-fiduciaries at BP concerning the safety protocols in place for BP's gas and oil operations was incorrect.

125.     During the Class Period, BP ADSs were an imprudent Plan investment because, *inter alia,* BP lacked adequate safety protocols in its offshore drilling operations which could result in hundreds of billions of dollars in liability for BP and BP p.l.c.

126.     Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether BP ADSs were a prudent investment for the Plans; failed to liquidate the Plans of BP ADSs; failed to discontinue further contributions of BP ADSs to the Plans; failed to remove or take other similar action BP ADSs as an investment option for the Plans; failed to either properly consult or appoint independent fiduciaries regarding the appropriateness of an investment in BP ADSs; and failed to resign as fiduciaries of the Plans if as a result of their employment by BP, they could not loyally serve the Plans and the Participants.  In fact, Defendants continued to invest and to allow investment of the Plan assets in BP ADSs even though they knew or should have known that BP had inadequate safety protocols in place for its gas and oil operations, resulting in a decrease in the value of BP ADSs.

127.     Further, Defendants breached their fiduciary duties by direct and indirect communications with the Participants, made in their fiduciary capacity, which contained statements concerning BP ADSs that these Defendants knew or should have known were untrue and inaccurate.  These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to BP's inadequate safety protocols in place for its gas and oil operations as discussed in this Complaint, that were contained in the following documents that, upon information and belief, were incorporated into plan documents disseminated to the Participants:  BP p.l.c.'s Annual Report on Form 20-F for the most recently ended fiscal year, BP

p.l.c.'s reports on Form 6-K, and any filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, and the Plan Annual Report on Form 11-K.

128.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

129.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan assets should not have been invested in BP ADSs during the Class Period.

130.    As a consequence of the Defendants' failures to act prudently, the Defendants caused significant losses to the Plans.

131.    The Plans suffered hundreds of millions of dollars in principal losses because Defendants imprudently invested the Plan assets in the BP Stock Fund during the Class Period in breach of Defendants' fiduciary duties.

132.    Defendants are liable for the Plan losses because the Plan investment in BP ADSs were a result of Defendants' decision to imprudently maintain the assets of the Plans in BP ADSs.  Thus, Defendants are liable for these losses because they failed to take the necessary, appropriate and required steps to ensure effective and informed independent participant control over the investment and decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

133.    Defendants withheld material, non-public facts from Participants and provided inaccurate and incomplete information to them regarding the Company's safety protocols in its

drilling operations and the soundness of BP ADSs as an investment vehicle.  As a consequence, Participants did not exercise independent control over their investments in BP ADSs, and Defendants remain liable under ERISA for losses caused by such investment.

134.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, including monitoring and removal of fiduciaries who failed to satisfy ERISA-mandated duties of prudence and loyalty, and eliminating BP ADSs as an investment alternative when it became imprudent, the Plans would have avoided some or all of the losses that they, and indirectly the Participants, suffered by continuing to invest in BP ADSs.

135.    Plaintiff, on behalf of the Plans, seeks alternative types of relief under ERISA.

136.    First, with respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in BP ADSs would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the Plans' lost value and puts the Participants in the position they would have been in had the Plans been properly administered.  Accordingly, Plaintiff, on behalf of the Plans, seeks lost profits as a result of Defendants' breaches.  In particular, Plaintiff, on behalf of the Plans, seeks the profit that had been lost by investing in BP ADSs instead of investing in other prudent funds within the Plans that were available at the time and which have outperformed the returns on the BP Stock Fund.

137.    Second, Plaintiff, on behalf of the Plans, seeks to recover the losses incurred by investing his retirement funds in BP ADSs when BP ADSs were a risky and imprudent investment.

138.    Third, Plaintiff, on behalf of the Plans, seeks a constructive trust -- both individually and on behalf of the Plans -- over all amounts by which the Plan fiduciaries benefited as a result of their breaches.  In particular, Plaintiff seeks to impose a constructive trust on the amounts received by Defendants for selling their BP shares, including amounts that certain Defendants received when they sold BP shares at the same time that those Defendants were causing the Plans to use Plan assets to acquire and hold BP ADSs.

139.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and interests on these amounts, as provided by law; and (v) such other legal or equitable relief as may be just and proper.

140.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

### CAUSES OF ACTION

### COUNT I

**Failure to Prudently and Loyally
Manage the Plans and the Plan Assets
(Breaches of Fiduciary Duties in Violation of ERISA § 404 Against All Defendants)**

141.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.     At all relevant times, Defendants were named fiduciaries pursuant to ERISA §
402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA §
3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty,
exclusive purpose, and prudence.

143.     As alleged above, Defendants were all responsible, in different ways and to
differing extents, over management of the Plans or disposition of the assets of the Plans and
were, during the Class Period, responsible for ensuring that the Plan investment options,
including the BP Stock Fund, made available to the Participants, were prudent and are liable for
losses incurred as a result of the imprudence of such investments.

144.     Additionally, pursuant to ERISA, fiduciaries are required to disregard plan
documents or directives they know or reasonably should know would lead to an imprudent result
or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. §
1104(a)(1)(D).  Thus, fiduciaries may not blindly follow plan documents or directives that would
lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow
others, including those whom they direct or who are directed by the plan, including plan trustees,
to do so.

145.     Defendants were obligated to discharge their duties with respect to the Plans with
the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent
person acting in a like capacity and familiar with such matters would use in the conduct of an
enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. §
1104(a)(1)(B).

146.     According to ERISA § 404, a fiduciary's investment or investment course of
action is prudent if: a) he or she has given appropriate consideration to those facts and

circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the Plan investment portfolio with respect to which the fiduciary has investment duties; and b) he or she has acted accordingly.    "Appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  – The composition of the portfolio with regard to diversification;

  – The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  – The projected return of the portfolio relative to the funding objectives of the plan.

147.    Given the mismanagement of BP as discussed herein, Defendants did not act prudently when they continued to invest the Plan assets in BP ADSs because, among other reasons, BP lacked adequate safety protocols in its offshore drilling operations which could result in hundreds of billions of dollars in liability.

148.    The participation in and knowledge of BP's dire situation as alleged herein is imputed and attributed to each Defendant.

149.     Defendants breached their duties to prudently and loyally manage the Plan assets. During the Class Period, Defendants knew or should have known that BP ADSs were not a suitable and appropriate investment for the Plans as described herein.  Nonetheless, during the Class Period, Defendants continued to invest the Plan assets in BP ADSs instead of other, more suitable, investments.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plans, and indirectly Plan Participants and beneficiaries, from suffering losses as a result of the Plan investment in BP ADSs.

150.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Participants and beneficiaries, lost a significant portion of their retirement investment.

151.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Provide Complete and Accurate Information
### (Breaches of Fiduciary Duties in Violation of
### ERISA Section 404 of ERISA 29 U.S.C. § 1104)

152.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

153.     At all relevant times, the scope of the fiduciary responsibility of all Defendants included Plan-related communications and material disclosures.

154.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information

participants need to exercise their rights and interests.  This duty to inform participants includes an obligation to provide plan participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding investment options such that participants can make informed decisions with regard to the prudence of investing in such options as are made available.  This duty applies to all plan investment options, including investment in the stock of the participant's employer.

155.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Participants, including statements regarding investments in the BP Stock Fund.  These communications included, but were not limited to, SEC filings, annual reports, press releases and Plan documents (including SPDs and/or prospectuses regarding the Plan holdings of BP ADSs), which included and/or reiterated these statements.  During the Class Period, BP p.l.c.'s SEC filings were incorporated into and part of the SPDs and/or the registration statements.

156.    Further, Defendants, as the Plan fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

- out of loyalty, employees tend to invest in company stock;

- employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

- employees tend not to change their investment option allocations in the plan once made;

- no qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

- lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

- even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

157.    While Defendants knew or should have known these facts and knew of the high concentration of the Plan funds in BP ADSs, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding BP's safety protocols in place for its oil and gas operations and/or did nothing to correct such statements.

158.    Defendants knew or should have known that investment in BP ADSs carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

159.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding BP's potential exposure to liability on account of its inadequate safety protocols, and the consequent risk and inflation of the value of BP ADSs and, generally, by conveying inaccurate information regarding BP's operations.  These failures were particularly devastating to the Plan and the Participants – losses in this investment had an enormous impact on the value of Participants' retirement assets.

160.    These actions and failures to act were uniform and caused the Plans, and/or the Participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in BP ADSs in the Plans at a time when Defendants knew or should have known that the Participants and beneficiaries lacked complete and accurate information concerning their investment in the BP Stock Fund.  Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of BP ADSs.

161.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan resulting in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment.   Here, the above-described statements, acts and omissions of the Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in BP ADSs and were material to any reasonable person's decision about whether or not to invest or maintain any part of his or her invested assets of the Plans in BP ADSs during the Class Period.   Plaintiff and other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts and omissions of the Defendants as described herein.

162.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses.   If Defendants had discharged their fiduciary duties to manage prudently and invest the Plan assets, the losses suffered by the Plans would have been minimized or avoided.   Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Participants and beneficiaries, lost a significant portion of their retirement investments.

163.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Monitor Fiduciaries**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404**
**by BP and BP p.l.c.)**

164.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

165.     This Count alleges fiduciary breaches against Defendants BP and BP p.l.c.

166.     As alleged above, during the Class Period, BP and BP p.l.c. were named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

167.     As alleged above, the scope of the fiduciary responsibilities of BP and BP p.l.c. included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries of the Plans, including the members of the Savings Plan Committee, the Investment Committee and the Investment Manager.

168.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

169.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plan performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

170.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know

that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

171.    Here, BP and BP p.l.c. breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about BP's business problems alleged above, which made BP ADSs an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their respective plan accounts.

172.    In addition, BP and BP p.l.c., in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of BP that they indisputably knew or should have known, that the monitored Plan fiduciaries needed to make sufficiently informed fiduciary investment decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, BP and BP p.l.c. breached their fiduciary duties under the Plans and ERISA.

173.    BP and BP p.l.c. are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored Defendants, it enabled the breaches by these Defendants and it had knowledge of these breaches, yet did not make any effort to remedy the breaches.

174.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the other Participants and beneficiaries, lost a significant portion of their retirement investment.

175.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), BP and BP p.l.c. are liable to restore the losses to the Plans caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

**Breach of Duty to Avoid Conflicts of Interest
(Breaches of Fiduciary Duties in Violation of ERISA § 404
Against Hayward, McKay, Atkins, Williamson, Dorazil, Shaw and Grote)**

176.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

177.   Hayward, McKay, Atkins, Williamson, Dorazil, Shaw and Grote are collectively referenced in this Count as the "Individual Defendants."  At all relevant times, as alleged above, the Individual Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

178.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

179.   The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

180.   Upon information and belief, because the compensation of many of the Individual Defendants was significantly tied to the price of BP ADSs, Defendants had an incentive to keep the Plan assets heavily invested in BP ADSs on a regular, ongoing basis.  Elimination of BP ADSs as an investment option would have reduced the overall market demand for BP shares and

sent a negative signal to Wall Street analysts, which would have adversely affected the price of BP shares, resulting in lower compensation for the Individual Defendants.

181.    Some Defendants may have had no choice in tying their compensation to BP shares (because compensation decisions were out of their hands), but Individual Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in BP ADSs.

182.    These conflicts of interest put the Individual Defendants in the position of having to choose between their own interests and the interests of the Participants.

183.    Defendants placed their own interests in investing the Plan assets in BP ADSs over the Participants' interest in maintaining a prudently invested ERISA plan.

184.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Individual Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

**Co-Fiduciary Liability**
**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)**

185.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

186.    This Count alleges co-fiduciary liability against all Defendants.

187.    As alleged above, during the Class Period the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

188.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

189.     ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Here, the Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

190.     BP and BP p.l.c., through their directors and employees, engaged in inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to BP and BP p.l.c. as a matter of law.

191.     Hayward, Grote, the Investment Committee and the Savings Plan Committee Defendants, by virtue of their positions at BP, participated in and/or knew about the BP and BP p.l.c.'s inappropriate safety practices, and their consequences, including the resulting imprudence of BP ADSs as an investment for the Plan assets.  Hayward, Grote, the Investment Committee and the Savings Plan Committee Defendants knew that SSBT was breaching its duties by continuing to invest the ESP's assets in BP ADSs when it was no longer prudent to do so, and providing incomplete and inaccurate information to Participants. Yet, Hayward, Grote, the Investment Committee and the Savings Plan Committee Defendants failed to undertake any

effort to remedy these breaches.  Instead, they compounded them by obfuscating the risk that BP and BP p.l.c.'s improper safety activities posed to BP, and, thus, to the Plans.

192.    SSBT knew or should have known that the information it was provided by BP regarding BP and BP p.l.c. and their safety practices, if any, was incorrect.  Accordingly, SSBT knew that the Investment Committee and the Savings Plan Committee Defendants were breaching their duties by continuing to invest the Plan assets in BP ADSs when it was no longer prudent to do so, and providing incomplete and inaccurate information to Participants.  Yet, SSBT failed to undertake appropriate efforts to remedy these breaches.  Instead, it compounded them by obfuscating the risk that the BP and BP p.l.c.'s improper safety activities posed to BP, and, thus, to the Plans.

193.    ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.   Upon information and belief, BP participated in the fiduciary breaches of the Administrator Defendants.  BP also, as a *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other Defendants.  Likewise, the Board Defendants participated in the breaches of the Administrator Defendants because, as alleged above, they knew or should have known of the Company's improper conduct and yet, ignoring their oversight responsibilities, permitted the Administrator Defendants to breach their duties.

194.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his

specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

195.    The failure of Defendants to monitor co-fiduciaries enabled them to breach their duties.

196.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the other Participants, lost a significant portion of their retirement savings.

197.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plan assets, and to restore to the Plans all profits the Defendants made through use of the Plan assets, and to restore to the Plans all profits that the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.      An Order that Defendants allocate the Plan recoveries to the accounts of all Participants who had their accounts invested in the common stock of BP maintained by the Plans in proportion to the accounts' losses attributable to the precipitous decline in the share price of BP p.l.c.;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including appropriate modifications to the Plans to ensure against further violations of ERISA.

Dated:  July 13, 2010                          Respectfully submitted,


                                               *By: /s/  Marvin A. Miller*                        
                                               Marvin A. Miller
                                               Matthew E. Van Tine
                                               **MILLER LAW LLC**
                                               115 S. LaSalle Street, Suite 2910
                                               Chicago, IL 60603
                                               Telephone: (312) 332-3400
                                               Facsimile: (312) 676- 2676
                                               E-mail: mmiller@millerlawllc.com

Robert I. Harwood
Jeffrey M. Norton
Tanya Korkhov
**HARWOOD FEFFER LLP**
488 Madison Avenue
New York, New York 10022
Telephone:  (212) 935-7400
Facsimile: (212) 753-3630
E-mail: rharwood@hfesq.com
E-mail: jnorton@hfesq.com
E-mail: tkorkhov@hfesq.com

Sanford P. Dumain
Lori G. Feldman
Arvind B. Khurana
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail: sdumain@milberg.com
E-mail: lfeldman@milberg.com
E-mail: akhurana@milberg.com

W. Mark Lanier
Evan M. Janush
**THE LANIER LAW FIRM**
6810 FM 1960 West
Houston, TX 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
E-mail: wml@lanierlawfirm.com
E-mail: emj@lanierlawfirm.com

Major Khan
**MAJOR KHAN LLC**
1120 Avenue of the Americas
Suite 4100
New York, NY 10036
Telephone: (646) 546-5664
Facsimile: (646) 546-5755
E-mail: mk@mk-llc.com

***Counsel for Plaintiff***